**UNITED STATES v. McCRILLIS et al.**

No. 4673.

United States Court of Appeals,
First Circuit.

Dec. 24, 1952.

David M. Scheffer, Litigation Atty., Washington, D. C. (Ed Dupree, Gen. Counsel, A. M. Edwards, Jr., Asst. Gen. Counsel, and Nathan Siegel, Sol., all of the Office of Rent Stabilization, Washington, D. C., on the brief), for appellant.

Harold S. Moskol, Providence, R. I., for appellees.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

In this case the United States appeals from a judgment for the defendant landlords in an action to recover statutory damages for rental overcharges under § 205, and to obtain an injunction and an order of restitution under § 206(b) of the Housing and Rent Act of 1947, as amended, 61 Stat. 193, 63 Stat. 18, 50 U.S.C.A. Appendix §§ 1895, 1896(b).

Again we meet the contention by the government, though there was nothing in the Act so providing, that a landlord defending an enforcement suit has no standing to challenge in the district court the validity of the regulation or order claimed by the government to have established the lawful maximum rent, where the landlord had failed to invoke available administrative procedure whereby he might have had the regulation or order set aside by administrative action.

In Smith v. United States, 1 Cir., 1952, 199 F.2d 377, this contention was examined at length and rejected. We adhere to our holding in that case.

It was pointed out in Smith v. United States, supra, that the discretionary rule adopted by courts of equity to the effect that a petitioner will be denied equitable relief where he has failed to pursue an administrative remedy under which he might obtain the same relief, is wholly misapplied when invoked against a landlord who is not seeking equitable relief but is merely defending himself against an enforcement action. We distinguished cases where the landlord was a petitioner seeking equitable relief by way of an injunction or declaratory judgment. Also we carefully distinguished the situation which was before us in Dauksewicz v. United States, 1 Cir., 1951, 194 F.2d 52, for reasons which need not be repeated. Cases under the Emergency Price Control Act of 1942 were said to be off the point, because there the Congress itself had withdrawn from the district courts jurisdiction or power to consider the validity of price or rent regulations or orders, and, as that Act originally provided, the only way to raise the issue of validity was by filing a statutory protest with the Price Administrator, followed by a complaint in the Emergency Court of Appeals upon administrative denial of the protest.

The situation was altered when the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., terminated on June 30, 1947. The Housing and Rent Act of 1947, which took over the field of rent control, contained no provision depriving courts, other than the Emergency Court of Appeals, of jurisdiction to determine the validity of regulations or orders issued under that Act. Thereafter, there was no statutory roadblock to prevent a landlord from challenging the validity of a rent regulation or order as a normal legal defense to an enforcement action based thereon. Further, there was no statutory

prescription excluding such defense if the landlord had failed to exhaust his administrative remedies. If Congress had intended thus to limit the defense of invalidity, the Act would probably have contained some provision for a mandatory stay of the enforcement proceeding pending the landlord's application for administrative review; the situation might well be that the affected landlord would be content not to contest the regulation or order further, as long as he was not brought into court to defend an enforcement action for alleged past violations predicated upon the regulation or order. Nor was there anything in the rent regulation (14 F.R. 5711) or in the rent procedural regulation (14 F.R. 1783) purporting to require exhaustion of administrative remedies, even if the administrative agency had regulatory power, which we do not believe it had, thus to limit the jurisdiction of the enforcement courts. All that the procedural regulation did was to provide an optional procedure whereby a landlord might obtain administrative review of rent regulations and orders in advance of being hailed into court to defend an enforcement action.

In the absence of any statutory provision on the subject, we stated in Smith v. United States, supra [199 F.2d 382], that we were not aware "of any general judge-made doctrine that a defendant in an enforcement suit, charged with having violated an administrative regulation or order, is precluded from setting up the defense that the regulation or order is invalid, merely because the defendant had failed to make use of an available administrative procedure by which he might have obtained administrative action to set aside the regulation or order." We know of no controlling precedent in the Supreme Court establishing any such proposition. Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, merely upheld the provisions of the original Price Control Act of 1942 under which the validity of a regulation or order could be challenged only by following the statutory protest procedure. Myers v. Bethlehem Shipbuilding Corp., 1938, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, also cited by the government, held that an employer, charged with the commission of unfair labor practices under the National Labor Relations Act, was not entitled to seek an injunction in a federal district court forbidding the National Labor Relations Board from holding a hearing upon the complaint, in view of the fact that the Act had provided an appropriate and exclusive procedure before the Board, and an adequate opportunity, through review by the circuit court of appeals, to secure judicial protection against a possible illegal action by the Board. Close on the heels of that case, in Federal Power Commission v. Metropolitan Edison Co., 1938, 304 U.S. 375, 385, 58 S.Ct. 963, 968, 82 L.Ed. 1408, the Court cited the Myers case in support of the proposition that "attempts to enjoin administrative hearings because of a supposed or threatened injury, and thus obtain judicial relief before the prescribed administrative remedy has been exhausted, have been held to be at war with the long-settled rule of judicial administration."

It is true that by the Defense Production Act Amendments of 1952, which became law June 30, 1952, Pub.L. 429, 82d Cong., 50 U.S.C.A.Appendix, § 2061 et seq., jurisdiction has been withdrawn from the district courts to consider the validity of rent regulations or orders; and now the validity of such regulations or orders, as well as of regulations or orders relating to price controls, can be challenged only through the protest procedure of § 407(a) of the Defense Production Act of 1950, followed by review in the Emergency Court of Appeals, or by an application under § 408(d) of the Defense Production Act, filed in the court in which enforcement proceedings are pending, for leave to file a complaint in the Emergency Court of Appeals attacking the validity of any provision of the regulation or order which the defendant is alleged to have violated. As indicating the purpose of these 1952 amendments, and showing a legislative awareness that prior thereto a landlord defending an enforcement action could test in the enforcement court the validity of the regulation or order he was charged with having

violated, we quote from H.Rep. No. 2177, 82d Cong., 2d Sess., p. 29:

"Some witnesses who testified before the committee with respect to rent control recommended that authority be granted to test the validity of rent regulations and orders in the Emergency Court of Appeals. It was claimed that at the present time the validity of a rent regulation or order could not be tested unless the person who desired to test it was either brought into court in a civil action brought by someone else, or sued the Rent Administrator in the District of Columbia. In order that the validity of rent regulations and orders may be tested by the persons affected without requiring them either to sue the Rent Administrator in the District of Columbia or be the subject of a civil action instituted by someone else, it was the opinion of the committee that the same procedure now applicable to the review of price control orders and regulations in the Emergency Court of Appeals should apply likewise to the review of the validity of rent regulations and orders."

The afore-mentioned provision of the Defense Production Act Amendments of 1952, withdrawing jurisdiction from the district courts to determine the validity of a rent regulation or order, is inapplicable to the case now before us, since the judgment of the district court in favor of the defendant landlords was entered March 27, 1952, which was prior to the date of the enactment of the 1952 Act.

So much by way of introductory comment, before considering the facts of the present case.

Appellees are the landlords of a single dwelling house in Providence, Rhode Island, within the Providence defense-rental area. The premises originally came under control pursuant to regulations (8 F.R. 7322) issued under the Emergency Price Control Act of 1942, 56 Stat. 23. Since the house was being rented on March 1, 1942, the freeze date for the area, "the rent for such accommodations on that date" became the maximum rent as initially established under the regulation. Such maximum rent, whatever its correct amount in fact, remained in this case the lawful maximum rent until the Emergency Price Control Act terminated on June 30, 1947.

The tenant on March 1, 1942, was one Charles H. Imhoff. According to a recital in the original registration statement filed by the landlords, the rent on the freeze date was $35 per month. In Kalwar v. McKinnon, 1945, 152 F.2d 263, 264, we said:

"It is clear, we think, that the figure put down by the landlord as the rent he was receiving on the freeze date does not become, even tentatively, the legal maximum rent. If the landlord makes a false statement in the registration statement, or if he neglects to file a registration statement, he may be subject to criminal penalties under § 205(b) of the Act; but in either case the legal maximum rent is determined by the formula set forth in § 1388.284, and in any litigation where the point becomes relevant the rent which was actually being charged on the freeze date must be factually determined."

There it was found by the enforcement court that the rent on the freeze date was in fact lower than the figure recorded in the registration statement; whereas here the landlords are claiming that the freeze date rent was more than that contained in the registration statement. But it works both ways. The recital in the registration statement that the freeze date rent was $35 per month stands in evidence as an admission by the landlord appellees, but it is not conclusive against them; and notwithstanding this admission the district court was satisfied on the whole evidence that the rent on March 1, 1942, was actually $65 per month. For the reasons stated in the latter part of this opinion, we accept this finding of fact by the district judge, since we are unable to conclude that it was "clearly erroneous". Rule 52(a) Fed.Rules Civ.Proc., 28 U.S.C.

In June, 1943, Imhoff was succeeded as tenant by one Nicholas Fleming, who agreed to pay $35 per month and to incur the expense of certain repairs. At this time Edgar McCrillis filed a "Report of Change in Tenancy", in which he recorded the names of the new and former tenants and stated that the maximum rent for the premises was $35 per month.

Fleming was still tenant on June 30, 1947, when the Emergency Price Control Act of 1942 terminated. In § 204(b) of the Housing and Rent Act of 1947, 61 Stat. 198, the Congress itself adopted and established as the starting maximum rent under that Act the maximum rent which was in effect on June 30, 1947, under authority of the Emergency Price Control Act. That maximum rent was the amount, whatever it was, that was in fact the rent for the house on March 1, 1942.

Earl Appleby occupied the house as tenant during the period October 1, 1947, through May 31, 1948, at a rental of $50 per month, which fact is undisputed.

On June 1, 1948, O. L. Bolin became the tenant, at a rental of $65 per month, which amount he paid monthly up through the month of May, 1949. At that point he filed a complaint with the local rent office that he was being charged in excess of the maximum rent as stated in the registration statement; thereafter Bolin tendered monthly checks in the amount of $35 which the landlords accepted and endorsed, noting thereon a claimed balance due.

The landlords filed with the area rent office, in July, 1949, a "corrected" registration statement, reciting that the rent on March 1, 1942, when Imhoff was tenant, was $65 per month.

 In view of the important discrepancy between the original and corrected registration statements, the area rent director undertook to determine the fact as to what was the rent on the freeze date, and thus to fix the maximum rent, under § 825.5(d) of the regulation reading as follows (14 F.R. 5718):

"*Orders where facts are in dispute, in doubt, or not known.* If the maximum rent, or any other fact necessary to the determination of the maximum rent, * * * is in dispute between the landlord and the tenant, or is in doubt, or is not known, the Expediter at any time on his own initiative, may enter an order fixing the maximum rent by determining such fact, * * * which order shall be effective to establish the maximum rent from July 1, 1947 or the date of first renting after July 1, 1947, whichever is applicable. If the Expediter is unable to ascertain such fact, or facts, he shall enter the order on the basis of the rent which he finds was generally prevailing in the defense-rental area for comparable housing accommodations on the maximum rent date".

An administrative proceeding of this sort, for the determination of rights and liabilities of particular individuals by finding of facts and application thereto of criteria set forth in the Act or regulation, is quasi-judicial in character; and under the requirements of procedural due process there must be notice to the affected parties and an opportunity to be heard. This is recognized in § 840.108 of the procedural regulation issued by the Housing Expediter (14 F.R. 1785) which provides that, when the area rent director deems it appropriate to enter an order under the above section of the regulation, he shall "before taking such action, serve a notice upon the landlord and tenant of the housing accommodations involved stating the proposed action and the grounds therefor." Provision is further made for the taking of evidence and a hearing.

On February 24, 1950, the area rent director issued an "Order Determining Maximum Rent", finding "that the rent on the date determining the Maximum Rent was $35.00 per month, which amount is the Maximum Rent for the housing accommodations"; and further providing that this order "in accordance with the Rent Regulation and the findings of the Rent Director indicated * * * above is effective from July 1, 1947".

■ For three reasons we think this order of February 24, 1950, was invalid:

(1) It is now conceded by the government that the landlords received no notice of the pendency of this proceeding; the first they heard of it was when a copy of the order was served upon them. Appellant argues that the order was not invalid on this account, because of the opportunity afforded by the procedural regulation to obtain a subsequent hearing satisfying the requirements of procedural due process. It is true that when an administrative agency issues a tentative order without notice, accompanied by a citation to show cause why the order should not be made effective, procedural due process is not thereby denied, for notice and opportunity to be heard is afforded before the order becomes effective as an administrative command. See United States v. Illinois Central R. R. Co., 1934, 291 U.S. 457, 54 S.Ct. 471, 78 L.Ed. 909; Opp Cotton Mills, Inc., v. Administrator of Wage and Hour Division, etc., 1941, 312 U.S. 126, 152–153, 657, 61 S.Ct. 524, 85 L.Ed. 624. That was the principle upon which 150 East 47th Street Corp. v. Creedon, Em.App., 1947, 162 F.2d 206 was decided. But the rent director's order of February 24, 1950, did not purport to be this type of order. If within ten minutes after its issuance, the landlord had received a monthly rental payment in excess of $35, he would have been in violation of the order, in accordance with its terms. In this connection appellant puts some reliance upon Victor v. Porter, Em. App., 1946, 157 F.2d 769, certiorari denied 1947, 329 U.S. 801, 67 S.Ct. 491, 91 L.Ed. 685. In that case the landlord filed a statutory protest against an order of the area rent director reducing a maximum rent. One of the grounds of objection to the order was that the hearing which preceded its issuance was not adequate to meet the requirements of procedural due process. The Price Administrator held an adequate de novo hearing, and made his own independent finding, with adequate evidence to support it, that the amount of the maximum rent fixed in the rent director's reduction order was the proper one under the applicable standards. Upon denial of the protest, a complaint was filed in the Emergency Court of Appeals. That court dismissed the complaint. In the circumstances there presented, under § 204(e)(2) of the Emergency Price Control Act of 1942, as amended, a judgment by the Emergency Court of Appeals setting aside the order reducing the maximum rent could not have been given retroactive effect. See Talbot v. Woods, Em.App., 1947, 164 F.2d 493, 496. Naturally the court declined to set aside the maximum rent prospectively, since there had been an adequate hearing at the protest level, and the Price Administrator had determined (upon evidence which the court found sufficient) that the maximum rent as set in the rent director's order was proper. We need not discuss in detail other cases in the Emergency Court of Appeals cited by appellant. They have been examined and we do not think that they are controlling.

(2) Since the Housing Expediter had prescribed in his procedural regulation that, before his subordinate, the area rent director, could issue an order under § 825.-5(d) of the regulation, he had to serve the landlord with adequate notice of his proposed action, it follows on general principles of delegation that the rent director's order of February 24, 1950, was not at all an order of the Housing Expediter. Furthermore, since under § 204(b) of the Housing and Rent Act the rent for the premises on March 1, 1942, automatically became the maximum rent on and after July 1, 1947, and remained such until changed by regulation or order of the Housing Expediter, this abortive "order" of the rent director wrought no change in the situation; and the complainant in any subsequent enforcement suit would necessarily have to establish as a fact what the rent was on the freeze date, just as the complainant would have to establish another crucial fact, namely, that the landlord demanded or received as rent a sum in excess of such maximum.

(3) In any event, an order of the sort here involved, under § 825.5(d) of the regulation, even if issued after notice and opportunity to be heard, could lawfully have effect only as fixing the maximum

rent prospectively from the date of its issuance. Here the order of February 24, 1950, purported to establish the maximum rent at $35 per month from and after July 1, 1947, the effective date of the Housing and Rent Act.

For cases where there is a dispute or doubt as to the facts necessary to the determination of a maximum rent, we can see that it was an appropriate exercise of the regulatory power, in aid of the orderly administration of the Act, for the Housing Expediter to provide, after notice and hearing, for the administrative determination of such doubtful or disputed fact, so as definitely to fix the maximum rent, *for the future,* in accordance with that determination. Once a maximum rent has thus been validly established, the landlord has got to observe it, and in an enforcement suit based upon alleged subsequent overcharges the landlord cannot go back of the order and get a trial de novo on the disputed fact.

But when the tenant Bolin complained to the area rent office in May, 1949, the appellees had either demanded and received an amount in excess of the maximum rent during the preceding periods, or they had not. That depended upon whether the rent on the freeze date was $35 or $65 per month. The Act itself fixed the maximum rent from and after July 1, 1947, continuing through the period of alleged violations here involved. If issues of fact should arise as to what rent was being charged on the freeze date, as well as what rent was being charged during the periods of alleged overcharges, these are ordinary factual issues that can be perfectly well determined in the enforcement court; they are not matters within the peculiar competence of. the administrative agency. It serves none of the purposes of the Act for the administrative agency, in anticipation of the filing of an enforcement suit relating to past violations, to make an administrative determination of one or more issues of fact which would normally be determined in the enforcement court. Section 204(b) of the Housing and Rent Act, as applied to the present case, itself prescribed that the maximum rent should be the rent for the house in question on March 1, 1942, *"Provided, however,* That the Housing Expediter shall, by regulation or order, make such adjustments in such maximum rents as may be necessary to correct inequities or further to carry out the purposes and provisions of this title". 61 Stat. 198. This did not authorize the Housing Expediter to change such maximum rent by a retroactive order like the order of February 24, 1950. So far as § 825.5(d) of the regulation purported to authorize such a retroactive order, the regulation itself was contrary to law.

It is perhaps significant to note that § 825.5(d) of the rent regulation issued under the Housing and Rent Act was drawn in large part from a corresponding provision of the rent regulation issued under the Emergency Price Control Act. But the Price Administrator never purported to authorize retroactive orders in this situation. See Markbreiter v. Woods, Em.App., 1947, 163 F.2d 993.

Resuming the chronological narrative, the United States filed its complaint in this case on March 21, 1950. It was alleged that the maximum legal rent was $35 per month, and that the landlords had overcharged tenants Appleby and Bolin an aggregate of $420 during the period October 1, 1947, to May 30, 1949. These allegations were denied in the answer.

In the early stages of the case it was disclosed that the United States was planning to rely upon the rent director's order of February 24, 1950, as conclusively establishing its allegation that the lawful maximum rent was $35 per month. When it was objected that this "order" was issued without notice or opportunity to be heard, the government undertook to fix that up. The area rent director on May 23, 1950, pendente lite, wrote a letter offering the landlords an "opportunity to submit evidence or reasons which might justify a revocation or modification of the order issued February 24, 1950 by this office." Some sort of hearing was held pursuant to this letter, and, so far as appears, it was adequate from the standpoint of procedural due process. On June 15, 1950, the rent director again wrote to the landlords, as fol-

lows: "The Rent Director has reviewed the case file of the above numbered docketed action, also all statements and evidence submitted by the landlord and tenant at the time of the oral hearing, and no cause for change having been found, it is determined that the order issued February 24, 1950 continues in effect without change."

We assume in the government's favor that this letter of May 23, 1950, was in effect notice of the initiation of a new proceeding under § 825.5(d) of the regulation, and that the letter of June 15, 1950, was in effect an order purporting to determine the maximum rent as $35 per month retroactive to July 1, 1947, in accordance with the terms of the earlier "order" incorporated by reference. This is the more indulgent interpretation, for the so-called order of February 24, 1950, was a nullity, and the first time the rent director made a determination of the disputed fact after notice and hearing of the landlords' version was when he wrote the letter of June 15, 1950.

But this letter of June 15, 1950, treating it as an order (otherwise it was nothing), came too late to be of any possible effect in the pending judicial proceedings. Not only was this order invalid for the third reason advanced above in discussion of the invalidity of the order of February 24, 1950; it was also invalid for an independent reason. Whatever might have been the power of the rent director to make such a retroactive order prior to the institution of suit, yet after the complaint by the United States was filed on February 21, 1950, and the relevant issues of fact had been committed to the determination of the court, the government could not restrict the jurisdiction of the court by swooping down with an administrative determination of the only serious issue of fact pending for decision in the judicial proceeding. This was held by the Emergency Court of Appeals in Collins v. Fleming, Em.App., 1947, 159 F.2d 431, certiorari denied, 1947, 330 U.S. 850, 67 S.Ct. 1094, 91 L.Ed. 1293, and in Senderowitz v. Clark, Em.App., 1947, 162 F.2d 912. Cf. Bowles v. Griffin, 5 Cir., 1945, 151 F.2d 458. "The

suggestion that a party to a controversy which is pending in a court for determination should have the right, pendente lite, to adjudicate factual issues involved in the litigation, is startling, to say the least. For such action would not only appear to involve the usurpation of judicial power which is vested in the courts alone, but would also clearly be at war with the fundamental concept of due process of law that parties to controversies are entitled to have them determined by an impartial tribunal." Lee v. Fleming, Em.App., 1946, 158 F.2d 984, 987–988.

We find nothing to the contrary in Addison v. Holly Hill Fruit Products, Inc., 1944, 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488. The problem there was wholly different. That was a suit by employees against an employer corporation engaged in packing and canning citrus fruits to recover minimum wages, overtime compensation, and liquidated damages under the Fair Labor Standards Act, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq. The wage and hour provisions of the Act were subject to an exemption in § 13(a)(10) as applied to "any individual employed within the area of production (as defined by the Administrator), engaged in * * * canning of agricultural * * * commodities for market". Thus, to implement the exemption Congress delegated to the Administrator (and not to the courts) a duty, quasi-legislative in character, of promulgating a definition of the statutory phrase "within the area of production". The Administrator issued such a definition. In the district court judgment went for the plaintiffs, which judgment was reversed by the circuit court of appeals. Upon certiorari, the Supreme Court determined that the Administrator's attempted definition was in its entirety unauthorized and invalid, and the problem then was what disposition to make of the case. The Supreme Court rejected as unacceptable two possible alternatives: (1) That employment in the particular industry was entirely exempt since the Administrator had misconceived the bounds of his regulatory powers, and (2) that employment in the industry was subject to the wage and hour provisions of the

Act without any exemption, because the Administrator had failed validly to define the boundaries of the exemption under § 13(a)(10). The court decided to remand the case to the district court with direction to retain jurisdiction until the Administrator should promulgate a valid definition of "area of production", and then to make appropriate disposition of the case in conformity thereto. A further distinction is that in Addison v. Holly Hill the United States was not the party-plaintiff, deciding its own pending case.

Our conclusion on this branch of the case is that the district judge quite rightly brushed off the two "orders" above discussed, and proceeded to decide for himself what the rent was on March 1, 1942.

Coming to the final point, the issue of fact as to what was the rent on March 1, 1942, the evidence offered by the defendants disclosed a situation certainly odd and unusual, but to us, reading the cold record, not inherently incredible, bearing in mind that truth is sometimes stranger than fiction.

There was uncontradicted testimony that the tenant preceding Imhoff paid a rent of $65 a month. When Imhoff came to rent the house in November or December of 1941, he was told that the rent was $65, but he said he could not pay more than $35. According to Edgar McCrillis, Imhoff was a bit peculiar and at times irrational, with a mental or physical infirmity of some sort. Imhoff had a friend, a Mrs. Clara Shippee, who took an interest in his welfare and nursed him or looked after him. In fact she later married him, but she died before this complaint was filed and her testimony was not available. McCrillis and his wife testified that Mrs. Shippee wanted Imhoff to take the house, for it just suited his needs. She offered, on condition that the arrangement not be disclosed to Imhoff, to pay the extra $30 per month if the house were rented to Imhoff at a stipulated rental of $35, which Imhoff was willing to pay. That arrangement was consummated, said the defendants. When rent control was subsequently imposed and the landlords filed their registration statement, they put down the rent on the freeze date as $35 per month, because that was what the ten-

ant himself had promised to pay, and they made no disclosure of the side arrangement with Mrs. Shippee, which was supposed to be kept secret from Imhoff. For that reason, Imhoff's testimony that he had never heard of the arrangement is not of much significance.

Defendants produced contemporaneous business entries made by them indicating that they were actually receiving $65 per month for the house on March 1, 1942. The registration statement was an admission to the contrary which had to be weighed with the other evidence in the case. Maybe McCrillis forgot the registration statement, or did not appreciate its significance as indicating prima facie what the maximum rent was. He was an elderly gentleman, 78 years old, and apparently played rent control procedures by ear, without benefit of legal counsel. If he had been conscious that his maximum rent was $35 per month, it may seem unlikely that he would have acted as he did, openly and without attempted disguise renting the house to Appleby at $50 per month and later to Bolin at $65, giving them month after month rent receipts for the full amount, and thus piling up evidence against himself. At any rate, this certainly is a case where the credibility of Mr. and Mrs. McCrillis was for the district judge, who stated: "I have observed Edgar McCrillis and his wife, the defendants, and also their daughter on the witness stand and have weighed their testimony. I believe that they testified truthfully."

There is no question but that under the definition of "rent" in the Emergency Price Control Act, 56 Stat. 36, and in the regulation issued thereunder (8 F.R. 7328), the important thing was not what the tenant himself had contracted to pay, but what the landlord demanded or received, whether from the tenant, or from someone else on his behalf, for the use and occupancy of the premises on March 1, 1942. In view of the findings by the district judge, which we accept, the maximum rent was $65 per month, and there were no overcharges.

The judgment of the District Court is affirmed.